U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

OCT - 7 2015

TONY R. MOORE  CLERK
BY _____
                DEPU

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

b

KERRY SANDERS,           CIVIL ACTION
    Petitioner           SECTION "P"
                         NO. 1:14-CV-03386
VERSUS

WARDEN, LOUISIANA STATE   JUDGE DEE D. DRELL
PENITENTIARY,             MAGISTRATE JUDGE JAMES D. KIRK
    Respondent


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by pro se petitioner Kerry Sanders ("Sanders"). Sanders is attacking his 2010 conviction by a jury in the Ninth Judicial District Court in Rapides Parish, Louisiana on one count of second degree murder; Sanders was sentenced to life imprisonment (Doc. 1). Sanders is presently confined in the Louisiana State Penitentiary in Angola, Louisiana.

Sanders raises the following grounds for relief in his habeas petition:

    1. Whether the state courts' decision was unreasonable in denying petitioner's ineffective assistance of counsel claim, when counsel failed to conduct pretrial investigations and interview crucial witnesses.

    2. Was the evidence sufficient to find petitioner guilty beyond all reasonable doubt?

    3. Did the trial court deny petitioner his right to Due Process of law when it upheld his guilty verdict without a unanimous twelve person jury?

The Respondent answered the petition (Doc. 14) and Sanders

filed a response (Doc. 36).   Sanders alleges and the Respondent admits exhaustion of Sanders' state court remedies.

Sanders' habeas petition is now before the court for decision.

<u>Facts and Procedural History</u>

The facts of this case as set forth by the Louisiana Third Circuit Court of Appeal at <u>State v. Sanders</u>, 74 So.3d 284, 285 (La. App. 3d Cir. 2011), writ den., 85 So.2d 115 (La.), cert. den., 133 S.Ct. 222 (U.S. 2012), are as follows:

> "This appeal involves the October 31, 2008 shooting death of Jarvis Brown on the front porch of an Alexandria, Louisiana residence. At the time of his death, Mr. Brown was having his hair cut by Adrian Williams. According to Adrian's testimony, the defendant, Kerry Sanders, approached the porch and inquired as to Mr. Brown's identity. Adrian testified that he and his brother, Marc Williams, who was also in front of the house, identified Mr. Brown to the defendant.   Mr. Brown eventually identified himself to the defendant by his nickname, 'G-money.' Adrian testified that he thereafter returned to his conversation and that within 'maybe twenty seconds,' a gun was fired. The record indicates that Mr. Brown was killed by a gunshot wound to the head. Adrian also sustained a gunshot injury to his hand.   While Adrian testified that he did not see the defendant 'pull the trigger,' he 'actually seen [sic], heard his voice, and glanced at [h]im that night.'
>
> "Thereafter, both Adrian and Marc ran into the house, where their nephew allegedly telephoned for assistance. Adrian and Marc testified that they thereafter left the area.   Testimony indicates that Adrian's vehicle was later stopped by a police officer, who called for an ambulance due to the gunshot wound to Adrian's hand. Questioning by the investigating officers revealed the defendant as the suspected perpetrator."

<u>Rule 8(a) Resolution</u>

This court is able to resolve the merits of this habeas corpus

petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition.  Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

### Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding.  Therefore, pure questions of law and mixed questions

3

of law and fact are reviewed under Section 2254 (d)(1), and questions of fact are reviewed under Section 2254(d)(2). <u>Martin v. Cain</u>, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.   A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. <u>Martin</u>, 246 F.3d at 476, and cases cited therein.

<u>Law and Analysis</u>

<u>Ineffective Assistance of Counsel</u>

First, Sanders contends state courts erred in denying his ineffective assistance of counsel claim, where counsel failed to conduct pretrial investigations and failed to interview crucial witnesses.   Specifically, Sanders contends his attorney failed to interview Betty Pryor prior to trial, even though she gave a pretrial statement which was exculpatory to Sanders, and failed to investigate and interview Kenneth Williams, the man Betty Pryor saw running away from the crime scene.

The Louisiana district court found Sanders failed to prove

4

that, but for his trial counsel's alleged errors, his trial would have turned out differently (Courtesy Copy, Vol. 4, pp. 1014-1017); the higher courts affirmed that ruling (Doc. 33, p. 1/42; Doc. 34, p. 37/49).

To prevail on a habeas complaint of ineffective assistance of counsel a complainant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984): (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. To make that determination the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. The court does not assess any alleged error in isolation. In an examination of state proceedings under 28 U.S.C. § 2254 the court will not reject an adjudication on the merits unless the action by the state court is found to be contrary to, or an unreasonable application of, clearly established federal law, or the state court's determination of the facts is manifestly unreasonable in light of the evidence. Jones v. Cain, 227 F.3d 228, 230 (5th Cir. 2000), and cases cited therein.

Counsel has a duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary. Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993), citing Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.   A determination of whether an investigation is reasonable adequate depends upon a variety of factors, including the number of issues in the case, the relative complexity of those issues, the strength of the Government's case, and the overall strategy of trial counsel. Baldwin v. Maggio, 704 F.2d 1325, 1333 (5th Cir. 1983), cert. den., 467 U.S. 1220, 104 S.Ct. 1669 (1984).   However, bare allegations do not suffice.   A defendant or petitioner who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.   Nelson, 989 F.2d at 850, citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).   Under Strickland, even where trial counsel has failed to adequately investigate a case, a defendant must demonstrate that he has been prejudiced by his counsel's failure.   See  Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987).   To show prejudice, the petitioner must prove that an alleged breach of his attorney's duty to investigate resulted in an actual and substantial disadvantage to the course of his defense.   Baldwin, 704 F.2d at 1333.

Betty Pryor, a witness for the defense, stated at trial that she did not remember the name of the man who spoke to her at her

home, before the trial, about what she saw the night of the murder
(Doc. 22, p. 32/46).  Betty Pryor initially testified that the man
she spoke to before trial was from the District Attorney's office,
but when defense counsel asked her if the man who interviewed her
was from the District Attorney's office or the Public Defender's
Office, she admitted she did not know (Doc. 22, p. 32/46).

A habeas petitioner has the burden of proving facts in support
of his claim.  Unsupported conclusory allegations do not warrant
habeas relief.  Uresti v. Lynaugh, 821 F.2d 1099, 1103 (5th Cir.
1987); Wilson v. Butler, 813 F.2d 664, 671 (5th Cir.), on rehearing,
825 F.2d 879, 881 (5th Cir. 1987), cert. den., 484 U.S. 1079, 108
S.Ct. 1059 (1988).  Since there is no evidence to show whether or
not defense counsel spoke to or investigated Pryor before trial,
Sanders has not supported his claim that his attorney failed to
investigate Pryor.  However, the fact that Pryor was called as a
defense witness tends to show that Pryor was interviewed by defense
counsel before trial.  Also, Sanders has not shown how he was
prejudiced by defense counsel's alleged failure to investigate
Pryor before trial; Sanders has not shown what his attorney would
have discovered from Pryor that would have changed the outcome of
his trial.

Sanders further contends his attorney failed to interview Opal
Parker before trial.  Opal Parker, another defense witness,
provided the police with their first description of the

perpetrator; Parker told the police that she saw Kenneth "Jack" Williams running from the scene and jumping over the fence.  At trial Opal Parker testified that she recalled speaking to the Assistant District Attorney on the Monday prior to trial (Doc. 23, pp. 18-19/47).  There is no evidence showing whether or not defense counsel investigated Parker prior to trial, but, again, the fact that Parker was called as a defense witness tends to indicate that the defense attorney interviewed her before trial.  Also, Sanders had not shown that, had his attorney properly investigated and interviewed Parker prior to trial, he would have discovered information that was not presented at trial and that would have changed the outcome of this trial.  Therefore, Sanders has not carried his burden of proving that defense counsel failed to investigate Parker prior to trial, nor has Sanders shown how he was prejudiced by defense counsel's alleged failure to investigate Parker.

Sanders contends that Detective Leach told the victim's mother that he knew who had committed the crime and it was only a matter of time before he was caught.  Sanders alleges that his trial counsel failed to investigate and find out what Detective Leach knew.  However, Detective Leach was called to testify for the defense[1] (Doc. 22, p. 38/45).  Detective Leach testified that the

---

[1] Sanders contends in his brief, erroneously, that Detective Leach was called to testify by the State (Doc. 1).

8

victim's mother told him she believed a man called "Biscuit" had killed her son (Doc. 22, p. 5/46).  Detective Leach testified that Biscuit's real name was Harry Christian, Jr., but he had been unable to contact or locate Christian (Doc. 22, p. 5/46). Detective Leach testified that was the only time Christian's name came up in the case (Doc. 22, p. 5/46); apparently no witnesses testified that Christian had been present at the murder.

Since Sander's trial counsel clearly discovered, and brought out at trial, what Detective Leach knew, he was not ineffective in this respect.  The fact that the jury clearly did not believe the crime had been committed by Christian is not the fault of Sander's attorney.  Sanders has not shown what other information his attorney should have discovered from Detective Leach that would have changed the outcome of his trial.

Finally, Sanders contends his attorney failed to prove Sanders was innocent through Opal Parker's testimony that Kenneth Williams jumped the fence after the crime occurred and that she heard Marc Williams say three times, "you got what you deserved," the fact that the victim's mother (Mrs. Brown) suspected the Williams family of setting her son up to be killed and also named Harry Christian as a possible suspect, and Stephanie Finney and Barbara Pryor testified they saw Sanders standing by a store on Texas and Lee between 9:30 and 10:00 p.m. on the night of the murder, making it impossible for him to have committed the crime.

The jury heard and weighed all of the evidence, including the exculpatory evidence set forth above, and found Sanders guilty. Although Sanders contends that his attorney did not investigate the case, Sanders has not pointed to anything that his attorney could have discovered that was not brought out at trial and that would have changed the outcome of the trial.  Sanders also has not identified any errors committed by his attorney that changed the outcome of his trial.

Since Sanders has not carried his burden of proving his trial counsel failed to investigate his case prior to trial and has not shown how he was prejudiced by the alleged failure to investigate, this ground for relief is meritless.

Ground 2 - Insufficient Evidence

Next, Sanders contends there is insufficient evidence to support his conviction for second degree murder.  Specifically, Sanders argues that the evidence was only circumstantial.  Sanders contends that no one testified that they saw him with a gun or that they saw him shoot the victim.

1.

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847 (1997),

10

citing, <u>Jackson v. Virginia</u>, 443 U.S. 307, 322-26, 99 S.Ct. 2781, 2791-92 (1979).    To apply this standard, the court looks to elements of the offense as defined by state substantive law. <u>Donahue v. Cain</u>, 231 F.3d 1000, 1004 (5th Cir. 2001).

A jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence is entitled to a great deal of deference by a reviewing court. <u>Marshall v. Lonberger</u>, 459 U.S. 422, 433-35, 103 S.Ct. 843, 850-51 (1983).    In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight. <u>Jackson</u>, 443 U.S. at 322 n.15, 99 S.Ct. at 2790 n.15.

In Louisiana, second degree murder is defined in La.R.S. 14:30.1, in pertinent part, as:

> A.   Second degree murder is the killing of a human being:
>      (1) When the offender has a specific intent to kill or to inflict great bodily harm;

2.

Adrian "Chuck" Williams testified that, on October 31, 2008, he was cutting Jarvis Brown's hair on the front porch, between 9:00 and 10:00 p.m. (Doc. 19, pp. 23-24, 42/46).  Adrian testified that, while he was cutting Jarvis Brown's hair, Kerry Sanders walked up, talked to Adrian's brother, Marc ("Toby") Williams, and asked where Adrian's mother was; Adrian's mother is Sanders' second cousin (Doc. 19, pp. 23/46, 18/45).  Adrian testified that, while Marc and

11

Sanders talked, he moved to face Jarvis' left side (Doc. 19, p. 24/46). Adrian testified that Jarvis was facing the road (Doc. 19, p. 24/46). Adrian testified that Sanders walked up, asked "Who is this?," pointing at Jarvis, and Adrian and Marc identified Jarvis to Sanders, explaining he was their friend and was also called "G" and "G-Money" (Doc. 19, pp. 24-25/46). Adrian testified that Sanders went back to where Marc was standing and they talked to him some more while Adrian told Jarvis he was almost finished with his hair, then a gun went off, and Adrian jumped in the air and ran because the bullet hit him in his left hand (Doc. 19, p. 25/46). Adrian testified that he crossed the flower bed, screaming, and saw Marc standing in the front yard screaming (Doc. 19, p. 25/46). Adrian testified that he grabbed Marc and they ran up the driveway and through the back door (Doc.19, p. 26/46). Marc told his mother to call an ambulance and she did, but Adrian went back outside, got into his girlfriend's car, and they went to his sister's house (Doc. 19, p. 27/46). Officers pulled up behind the car and Adrian told them to go to his mother's house because there was someone on the front porch with a gun (Doc. 19, pp. 27-28/46).

Adrian testified that he had known Sanders for more than twenty years, and he did not see him shoot Jarvis Brown (Doc. 19, p. 39/46). Adrian went to the hospital for treatment, then to the police station (Doc. 19, p. 42/46). Adrian told the police that he, his Uncle Gordon, Jarvis, and Marc were on the porch when

Jarvis was shot (Doc. 19, p. 1/45).  Adrian testified that his
Uncle, Gordon Brower, had also been on the porch earlier, but had
gone to the store for Jarvis (Doc. 19, p. 2/45).

Adrian testified that the shot came from somebody in the front
yard, not on the porch (Doc. 19, p. 5/45).  Adrian testified that,
at the time of the shooting, Marc was standing by the flower bed,
off the porch (Doc. 19, pp. 42-43/45).  Adrian testified that the
front porch faced the street (Doc. 19, p. 11/25), and Jarvis was
sitting in a chair with his back to the house, facing the street
(Doc. 19, pp. 13-14/25).  Adrian testified that the person walked
up to Jarvis' left side and shot Jarvis in his left side (Doc. 19,
p. 6/45).  Adrian testified that, to his knowledge, Sanders did not
know Jarvis (Doc. 19, p. 16/45).  Adrian testified that, when
Jarvis was murdered, he knew Sanders had done it, and Marc told
their mother that Sanders had done it (Doc. 19, p. 20/45).

Dr. Collie Trant, a forensic pathologist, testified that the
gun muzzle was within two to three inches from Jarvis' head and the
gun was held perpendicular to his head (Doc. 19, pp. 34-35/45).
Trant testified that the bullet was not found (Doc. 19, p. 35/45).
Trant testified that the wound and trajectory were consistent with
someone sitting in a chair and a shooter standing (Doc. 19, p.
35/45).  The shooter was standing within arms' length from Jarvis
(Doc. 19, p. 35/45).

Gordon Brower testified that on October 31, 2008, he was at

13

his sister's house waiting to get a haircut while his nephew was
cutting Jarvis' hair, when Kerry Sanders walked to the gate, stood
there a little while, and pulled out a gun (Doc. 19, pp. 17-18/25).
Gordon testified that he saw Sanders shoot, then Gordon ran to call
Jarvis' mother (Doc. 19, p. 18/25; Doc. 20, p. 3/48).   Gordon
testified that, when he returned, Sanders was gone (Doc. 19, p.
18/25).

   Gordon testified that Gordon, Adrian, Sanders, and Marc were
there that night (Doc. 19, p. 22/25).   Gordon testified that,
before the shooting, he went to the convenience store on the corner
(Doc. 20, pp. 4-5/48).  When he returned from the store, Gordon saw
Marc on the side of the house (Doc. 20, p. 5/48).  Gordon then sat
on a milk crate and waited to get his haircut (Doc. 19, p. 23/25).
Gordon testified that, when Sanders walked up, he asked how they
were doing, shook Gordon's hand, then he asked Adrian whose hair he
was cutting, Jarvis told him what his name was, then Sanders walked
to the gate, walked back again, pulled out a gun, and shot Jarvis
(Doc. 19, p. 19/25).   Gordon testified that Sanders was there for
about ten to fifteen minutes (Doc. 19, p. 19/25).   Gordon further
testified that Kenneth Williams ("Jack") was not there when the
shooting occurred, but he arrived afterward and saw what had
happened (Doc. 19, p. 24/25).  Gordon testified that Marc Williams
("Toby") was there, on the side of the house, and Marc ran around
to the front of the house when the shot was fired; Gordon did not

14

see Marc with a gun (Doc. 19, p. 24/25; Doc. 20, p. 2/48). Gordon testified that Adrian had been shot, too, and he ran around to the side of the house (Doc. 20, p. 2/48).

Detective Ronny Howard of the Alexandria Police Department testified that Gordon Brower picked Kerry Sanders out of a photographic lineup as the shooter (Doc. 20, p. 12/48).

Marc ("Toby") Williams testified that, when he arrived at the house at about 8:00 p.m., his brother (Adrian Williams), his mother (Betty Williams), and his nephews (Dominic Bradford and Cameron Parker) were there (Doc. 20, pp. 24, 26, 29/48, p. 14/33). Marc testified that his nieces and nephews (Cameron, Dominic, Markel, Kaydra and others) were inside watching TV in the bedrooms (Doc. 20, p. 16/33). Marc testified that his nephew Kenneth ("Jack") Williams was not there, but he had seen him earlier in the day (Doc. 20, pp. 29-30/48, p. 12/33). Marc testified that, when he arrived at the house, he saw Adrian outside cutting Jarvis' hair (Doc. 20, p. 30/48). Marc testified that Jarvis was a good friend who visited the house almost every day (Doc. 20, p. 31/48). Marc testified that, when Sanders arrived, Marc was standing in front of the house and Adrian was cutting Jarvis' hair (Doc. 20, p. 32/48). Marc testified that Jarvis' chair was facing the road and its back was to the front door (Doc. 20, p. 34/48). Marc testified that, when he first saw Sanders that evening, Sanders was walking down the street toward the driveway side of the house (Doc. 20, p.

15

25/48).  Marc testified that he first noticed Sanders in the street
when he was talking to Adrian and Jarvis, then he next noticed
Sanders when he was in the middle of the driveway (Doc. 20, p.
36/48, p. 33/33).  Marc testified that Sanders started skipping
like he had to go to the bathroom very badly, then Sanders went
straight down the side of the house and Marc looked at Adrian as if
to say Sanders just had to pee (Doc. 20, p.  36/48, p. 33/33).
Marc noticed that Sanders was taking a while to pee, but when he
looked down the side of the house again, Sanders was walking back
up; Marc testified that he did not think Sanders had not gone into
the house to pee (Doc. 20, pp. 36-37/48; Doc. 21, p. 1/47).  Marc
testified that Sanders asked where Marc's mother was, and Marc told
him she was in bed, but thought it was strange that Sanders had
asked him that (Doc. 20, p. 37/48; Doc. 21, p. 3/47).

Marc testified that his son, Markel, came out of the house and
asked Marc if he was ready to take him to watch his little brother,
and Sanders told Markel that he was the "one been selling [him]
that bunk weed" (Doc. 20, p. 37/48; Doc. 21, p. 3/47).  Marc told
Sanders that Markel was his son and did not sell drugs, and Markel
told Marc that he did not know who Sanders was (Doc. 20, pp 37-
38/48).  Markel then went back into the house and Sanders stepped
up to the porch and asked who Jarvis was, and Adrian and Jarvis
told him Jarvis' nicknames (Doc. 20, p. 38/48; Doc. 21, p. 5/47).
Marc testified that Sanders then stepped around Marc and shot

16

Jarvis; Marc testified that he did not see Sanders' gun before he shot Jarvis (Doc. 20, pp. 38-40/48; Doc. 21, pp. 5-7, 10/47). Marc testified that Sanders pulled the gun out, put it to Jarvis' head, and pulled the trigger, then he walked back to the driveway, put the gun down his pants, and started running (Doc. 20, pp. 41-43/48; Doc. 21, p. 12/47). Marc testified that he ran into the house, told his mother what had happened and told her to call 911, his nephew Dominic called 911, Adrian left, and Marc walked up the street, crying (Doc. 20, p. 44/48, p. 16/33; Doc. 21, pp. 16-17/47). Marc testified that Gordon had gone to the store but returned in time to see the shooting (Doc. 20, p. 45/48, pp. 25-26/33); Marc did not see where Gordon was standing when the shooting took place (Doc. 20, pp. 26-27/33).

Betty Williams testified that on October 31, 2008, she arrived home about 9:30, saw Adrian cutting someone's hair on the porch, went inside her house and took a bath, then watched TV in her bedroom with her grandson (Doc. 21, p. 40/47). Betty testified that Adrian and Mark ran inside, screaming that Sanders had just shot Jarvis on the porch (Doc. 21, p. 43/47). Betty also testified that Detective Leach had commented to her that he knew who had shot Jarvis and it was just a matter of catching him, but Betty did not ask him who he was talking about (Doc. 21, p. 5/6).

Stephanie Finney testified that Sanders had dated her daughter (Doc. 22, pp. 16 & 18/46). Finney testified that, on October 31,

17

2008, she got off work at Louisiana College at about 9:00 p.m., spent about fifteen minutes picking up her friend, Barbara Pryor, and drove to WalMart (Doc. 22, p. 17/46).  Finney testified that, on her way to WalMart, when she was driving up Lee Street and crossing Texas Avenue, she saw Sanders standing by a store; Finney testified that she made the block and passed by again to make sure it was Sanders (Doc. 22, p. 18/46).  Finney testified that she was "being nosey" and trying to see if Sanders was with another woman (Doc. 22, p. 18/46).  Finney testified that she saw Sanders with a "short, fat guy," so she got out of her car while Pryor went in a store, touched Sanders on the shoulder, and they both said "hi" (Doc. 22, p. 18/46).  Finney testified that she saw Sanders sometime between 9:30 and 10:00 p.m. (Doc. 22, p. 20/46).  Finney testified that she heard about the murder on the news the next day, and Sanders' attorney contacted her and asked her about having seen Sanders the day of the shooting (Doc. 22, p. 19/46).  Finney testified that an investigator from the District Attorney's office also contacted her (Doc. 22, p. 27/46).

Barbara Ann Pryor testified that on October 31, 2008, Finney had picked her up after work and they were driving down Lee Street; they stopped at a store on Lee Street that Pryor wanted to go into and, when Pryor came out, she saw Finney talking to Sanders; Sanders used to date Finney's daughter (Doc. 22, p. 31/46).  Pryor testified that she thought it was about 9:30 p.m. (Doc. 22, p.

33/46).  Pryor testified that she had never seen Sanders before and learned of the murder the next day when her husband told her about it (Doc. 22, p. 32/46).  Pryor testified that someone went to her house and talked to her about having seen Sanders on October 31, 2008, but she was not sure whether the person was from the District Attorney's Office or the Public Defender's office (Doc. 22, p. 32/46).

Opal Parker testified that she lived one house away from where the murder took place and was in her front yard on October 31, 2008 when the shot was fired at about 9:00 or 9:30 p.m. (Doc. 22, p. 11/13).  Parker testified that she was having a fight with her boyfriend, Christopher Stafford, in the front yard, when she heard arguing coming from the Williams' front porch (Doc. 22, p. 12/13). Parker testified that she saw Jarvis Brown there, getting a haircut, Marc Williams, Gordon Brower, Adrian Williams, and Kenneth ("Jack") Williams ((Doc. 22, p. 13/13; Doc. 23, pp. 1-2/47). Parker testified that she saw Kenneth Williams jump over a fence (Doc. 23, p. 3/47).  Parker testified that she heard Marc Williams arguing with somebody (Doc. 22, p. 8/47).  Parker testified that she heard one shot, then she and her boyfriend ran into the house (Doc. 23, p. 8/47).  Parker testified that she stayed inside about two minutes then went back outside and saw Kenneth ("Jack") Williams jump over the fence, then turn around and asked Pryor what had happened (Doc. 23, p. 8/47).  Parker testified that she did not

19

respond, but turned around instead, and he was gone when she turned back around (Doc. 23, p. 10/47).  Parker testified that she saw Kenneth Williams in the yard when the shot was fired, then he jumped over the fence, went up Levin and came back on Eastwood (where the house was located) and asked Parker what had happened (Doc. 23, pp. 9-10/47).  Parker also testified that she did not see Gordon Brower or Marc Williams after the shooting, but she heard Marc Williams say "You got what you deserved" about three times (Doc. 23, pp. 10-11/47).  Parker testified that she gave a statement to the police and spoke to Sanders' attorney and the District Attorney's office about what she saw (Doc. 23, pp. 11-12/47).  Parker testified that she did know Sanders and did not see Sanders on the night of the shooting (Doc. 23, p. 12/47).  Parker testified that she knew everyone in the yard when the shooting took place (Doc. 23, p. 12/47).  Parker further testified that she Adrian Williams jumping over the back fence and running away, holding his arm, saw a car stop next to him, and he may have gotten into that car (Doc. 23, pp. 13-14, 22-23/47).

Corporal Doug Alford testified that he and Corporal Gary Mouliere responded to the 911 call and spoke to Opal Parker on the night Jarvis was shot (Doc. 23, pp. 5-6/39).  Alford testified that Opal Parker told them she was in her house when she heard some arguing going on outside, she picked up her phone, called her "old man," then she heard two gun shots and saw a black male running

down the street (Doc. 23, p. 7/39).  Alford testified that Parker
did not tell them she was outside when the shots were fired, did
not tell them she saw someone jump a fence and run, and did not
tell them that she heard someone say, "you got what you deserved"
(Doc. 23, pp. 7-8/39).

Corporal Mouliere testified that he and Corporal Alford were
the first to respond to the 911 call (Doc. 23, p. 13/39).  Mouliere
testified that Parker told them she had been inside her house,
heard the gunshots, went outside, and saw a black male running from
the area (Doc. 23, p. 15/39).  Mouliere testified that Parker did
not tell them that she saw a person running and holding his arm,
that she saw someone jump a fence, or that she heard anyone say,
"you got what you deserved," and that she did not give them any
names (Doc. 23, p. 14/39).

3.

There was evidence indicating both that Sanders shot Jarvis,
and that Sanders was not there when Jarvis was shot.  The Williams
family members testified that Sanders shot Jarvis; Marc and Gordon
both testified they saw Sanders shoot Jarvis.  However, Finney and
Pryor testified they saw Sanders somewhere else at the time of or
not long after Jarvis was shot, and Parker testified that Sanders
was not in the Williams' yard when Jarvis was shot.

Sanders argues that, in order to be convicted with
circumstantial evidence, the evidence must exclude every reasonable

hypothesis of innocence, citing La.R.S. 15:438.  However, Sanders
has not put forward a reasonable hypothesis of innocence, and only
contends that someone else must have shot the victim, pointing to
Parker's testimony showing that Kenneth Williams ran away from the
scene and jumped over the fence, and that Marc Williams said, "You
got what you deserve."

The Louisiana Court of Appeal found, on direct appeal, that
there was sufficient evidence to support the verdict.  Sanders, 74
So.3d at 288.  The Court noted that Opal Parker's testimony had
been rebutted by Corporal Doug Alford and Corporal Gary Mouliere of
the Alexandria City Police, who both testified that, on the day of
the murer, Parker told them she had been inside her house, heard
the gunshots and gone outside; Parker did not tell the police that
she had seen someone jump a fence.  The Court further noted that
eyewitnesses to the event identified Sanders as the perpetrator.

Viewing the evidence in the light most favorable to the
prosecution, and giving due weight to the credibility
determinations of the jury and the reasoned finding by the state
appellate court that there was sufficient evidence to support
Sanders' conviction, Sanders, 74 So.3d at 288, there is sufficient
evidence to support the jury's finding that Sanders shot Jarvis.

Therefore, there is sufficient evidence to support Sanders'
second degree murder conviction, and this ground for relief is
meritless.

Ground 3 - Unanimous Jury Verdict

Sanders contends the trial court denied petitioner his right to Due Process of law when it upheld his guilty verdict without a unanimous twelve person jury, claiming that, when the trial judge excused the two alternate jurors, that left only ten jurors to convict him.

On direct appeal, the Louisiana Court of Appeal found there was a unanimous verdict, by twelve jurors, of guilty. Sanders, 74 So.3d at 289.

Sanders misapprehends the verdict and procedure. Although the two alternate jurors were excused before jury deliberations began (Doc. 15, p. 7/45; Doc. 24, p. 28/42), there were still the twelve principal jurors to decide the verdict; the two alternate jurors were the thirteenth and fourteenth jurors, chosen in the event one of the twelve principal jurors became unable to finish the trial. See La.C.Cr.P. art. 789. The jury was polled after the verdict was given, the Clerk of Court asked each principal juror whether "guilty of second degree murder" was their verdict, and all twelve jurors said "yes" (Doc. 24, pp. 31-32).[2]  Therefore, Sanders was convicted by a unanimous vote of twelve jurors.

_____

[2] An issue arose after trial as to whether juror Ruth Wilson had voted to convict Sanders (Doc. 25, pp. 36-46/52).  However, Ruth Wilson stated under oath, when polled, that she had voted to convict Sanders (Doc. 24, p. 32/42), and stated again at a post-trial hearing that the jury had voted unanimously to convict Sanders (Doc. 25, p. 26/35).

This ground for relief is meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Sanders' habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

24

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases (and other habeas cases, see Rule 1(b)) in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** See 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED in Alexandria, Louisiana on the _____ day of October 2015.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE